**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Ft. Lauderdale Division**

AMERICAN PROPERTY INSURANCE
COMPANY, a foreign corporation,
        Plaintiff,

                                   Case No:

v.

SOUND CONNECTION DISTRIBUTORS, INC.,
a Florida for Profit Corporation; SHIMON SWISSA,
individually; ZEVULONI & ASSOCIATES, INC.,
a Florida for Profit Corporation; and JOSEPH
ZEVULONI, individually.
        Defendants.
_____/

## CIVIL ACTION COMPLAINT

The Plaintiff, AMERICAN PROPERTY INSURANCE COMPANY ("APIC"), through

its undersigned counsel, hereby files this complaint against the Defendants, SOUND

CONNECTION DISTRIBUTORS, INC., a Florida for Profit Corporation; ZEVULONI &

ASSOCIATES, INC., a Florida for Profit Corporation; SHIMON SWISSA; individually; and,

JOSEPH ZEVULONI, individually, and in support hereof, states and alleges as follows:

### THE PARTIES

1.      Plaintiff, APIC, is a New Jersey corporation with its principal place of business at

4 Industrial Way West, Suite 102, Eatontown, New Jersey 07724.  It is, thus, a citizen of New

Jersey for diversity purposes.

2.      The Defendant, SOUND CONNECTION DISTRIBUTORS, INC. ("SOUND

CONNECTION"), was at all material times, a Florida for-profit corporation, with its principal

place of business at 2801 Greene Street, Hollywood, Florida.  It is, thus, a citizen of Florida for diversity purposes.

3.     The Defendant, SOUND CONNECTION, was the named insured under a policy of insurance issued by APIC, which provided Commercial General Liability and Property Coverage, described more fully below.  It also owned the subject property, which, as relevant to the instant matter, was insured by APIC and is located at 2801 Greene Street, Hollywood, Florida.  This property is hereinafter referred to as the "insured property" or the "insured premises."

4.     The Defendant, SHIMON SWISSA, is *sui juris* and a resident of Broward County, Florida.  He is, thus, a citizen of Florida for diversity purposes.  He is the owner of the defendant, Sound Connection.

5.     The Defendant, ZEVULONI & ASSOCIATES, INC., was at all material times, a Florida for-profit corporation, with its principal place of business at 10130 NW 47th Street, Sunrise, Florida.  It is, thus, a citizen of Florida for diversity purposes.

6.     The Defendant, JOSEPH ZEVULONI, is *sui juris* and a resident of Broward County, Florida.  He is, thus, a citizen of Florida for diversity purposes.  He is a licensed "public adjuster" pursuant to Florida statutes and regulations pertaining to same.

7.     The Defendant, Zevuloni & Associates, Inc., hired or contracted with a third-party, Donald J. Antol, who *was* a licensed general contractor and roofer, to assist in preparing the subject damage estimates, which are discussed in more detail below, who might need to be subsequently added to the complaint as a defendant *via* an amendment.  If that is the case, his addition will not defeat diversity jurisdiction as he is a *sui juris* individual and a resident of either

Palm Beach County or Broward County, Florida.  He is, thus, a citizen of Florida for diversity purposes.

## JURISDICTION AND VENUE

8.     Subject matter jurisdiction is based upon diversity of citizenship pursuant to 28 U.S.C. §1332, in that the plaintiff is a citizen of New Jersey and all defendants are citizens of Florida; and, the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.  In fact, the underlying claim of Sound Connection for damages allegedly sustained by Hurricane *Irma* which it is seeking against APIC is in excess of $3.8 million.

9.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391(a) because the acts and omissions that gave rise to this matter took place in this jurisdiction, and the insured property is located within this district.

10.     There is *in personam* jurisdiction over all defendants since they are either Florida residents or Florida corporations.

11.     All conditions precedent to bringing this action have been performed or are otherwise waived.

## BACKGROUND FACTS

12.     On May 24, 2017, the defendant's, Sound Connection's, prior insurance policy that covered the insured property lapsed.  Since this was, essentially, at the very start of hurricane season, Sound Connection desperately needed another insurance policy covering the insured premises.

13.     On May 25, 2017, an application for insurance with APIC pertaining to the insured property was prepared by Sound Connection; it was signed by the defendant, Shimon

Swissa, the owner of Sound Connection, on June 26, 2017.  A copy of that application is attached hereto as *Exhibit A*.

14.     In reliance upon the truthfulness and accuracy of the representations and statements made in the application, APIC issued its policy of insurance covering the insured property, which policy was to be effective from May 26, 2017, to May 26, 2018.  The subject policy has a Building Limit of coverage for $3,250,000.00.  A copy of APIC's insurance policy is attached hereto as *Exhibit B*.

15.     In the application, the operations of the named insured, Sound Connection, was described as "wholesale distribution of electronic goods."  Inspection showed that, while that once might have been the case, there were no such operations ongoing at the time periods relevant hereto.

16.     In the application, Sound Connection failed to disclose that a related corporation that was also owned by Shimon Swissa operated a night club of sorts at the insured property, called "Mega Vault," which included a dance floor, wine vault and a full bar, and which was typically and routinely rented by third-parties for various events and parties.

17.     In the application, Sound Connection misrepresented that the entity that operated "Mega Vault" had its own insurance program with respect to its operations at the insured property.

18.     In the application, Sound Connection, misrepresented that "Mega Vault" was a "catering hall," saying nothing about the service of, among other things, alcohol.

19.     In the application, Sound Connection failed to properly describe the operations of another type of business that was operated by another related company, also owned by Shimon Swissa, at the insured property under the name Shimon's Cars, which purchased used cars, cars

at auction, and salvaged cars which were repaired and then sold to third-parties, all at the insured premises.

20.     In the application, Sound Connection misrepresented that the entity that operated Shimon's Cars at the insured property had its own insurance program for all of its operations.

21.     APIC issued the insurance policy, and rated the premium that was charged for it, based upon the truthfulness and accuracy of the answers, statements and representations provided by the insured, Sound Connection, in the insurance application.

22.     On September 10, 2017, Hurricane *Irma* impacted, to some extent, the Southeast Florida area, although it was a much stronger wind event in the central and northern parts of the state.  It is, in fact, not clear at all whether the area of the insured premises actually experienced hurricane-force winds.

23.     On or around October 16, 2017, more than one month after Hurricane *Irma*, Sound Connection retained Zevuloni & Associates, Inc. and its principal, Joseph Zevuloni, to act as its public adjuster with respect to making a claim against APIC for alleged damages to the insured premises, the buildings and structures thereon, and certain of the building's contents.

24.     On or around October 18, 2017, Sound Connection retained a company called "Dry Master Specialists, Inc.," which was referred by defendant Joseph Zevuloni, to allegedly perform water/moisture mitigation at the insured property even though this was five weeks after *Irma*.  Sound Connection did not actually to pay cash to Dry Masters for its alleged work at the insured premises; rather, Dry Masters worked on an assignment of insurance benefits from Sound Connection and ended-up charging APIC more than $177,000.

25.     The subject insurance policy issued by APIC has a Policy Property Endorsement, titled "Emergency Repairs Limits," which states:

> Subject to any other written correspondence, the specified aggregate annual limit afforded under this policy for the purpose of procuring emergency repairs or measures occurring within 96 hours of the loss occurrence, and exclusively to prevent subsequent loss to covered property is $25,000; and does not exceed any other applicable coverage limit(s). This provision does not supersede any conditions, limitations, loss adjustment procedures, or duties in the event of a loss as described in the policy documents and is subject to the specified deductible stated in your policy.

26.     The first water mitigation services provided in response to the September 10, 2017 Hurricane *Irma* claim did not, as stated above, occur until *five weeks after Irma*. The insured, thus, failed to utilize the money available to it under the "Emergency Repairs Limits."

27.     On or around October 30, 2017 -- *i.e.*, nearly fifty days after the storm and two weeks after it hired Zevuloni -- APIC was *first notified* by Sound Connection that it allegedly suffered property damage as a result of Hurricane *Irma*. Needless to say, this sort of a delay obviously prejudiced APIC's ability to properly investigate and assess Sound Connection's claims.

28.     Notwithstanding this significant delay, APIC acted promptly, and on November 2, 2017, APIC inspected the property so as to assess the alleged hurricane-related damages, to the extent that they still existed. APIC conducted this inspection, and all subsequent inspections, under a full reservation of rights.

29.     On or about November 9, 2017, APIC sent correspondence to Sound Connection requesting documents to support its claim of alleged hurricane damages.

30.     Sound Connection again delayed significantly, and responded to APIC's document request three months later, on February 8, 2018, and, even then, did not provide all of the requested information.

31.     A second and third request for the supporting documents were sent to Sound Connection on February 26, 2018, and February 28, 2018.

32.     Sound Connection again significantly delayed, and on June 1, 2018, over three months from the follow-up request, it responded with another incomplete production of documents, and, *for the first time*, supplied APIC with a Sworn Proof of Loss, which, of course, the policy required the insured to provide much earlier.

33.     Due to the incomplete documentation and the complexity of the claim, APIC elected to take the Examination Under Oath ("EUO") of Sound Connection, by its owner and principal, the defendant, Shimon Swissa, and made this request in writing to Sound Connection on June 7, 2018.

34.     The Examination Under Oath of the defendant, Shimon Swissa, was set for July 6, 2018.

35.     The EUO was reset to July 19, 2018, at the request of counsel for Sound Connection because, according to counsel, the requested documentation had still not all been located.

36.     Less than twenty-four hours prior to the July 19, 2018 EUO, Sound Connection, through its counsel, send APIC's counsel a Dropbox link containing, allegedly the remainder of the requested documents.   However, the documents in the link were totally disorganized; they were not indexed, bates stamped, or identified as being responsive to APIC's particular enumerated requests.

37.     Due to the late production of the documents and the complexity of the claim, the EUO of Mr. Swissa was not completed in one day and was set for a second day, July 26, 2018.

38.     On July 24, 2018, two days prior to the second day of the EUO, counsel for Sound Connection provided another Dropbox link of unindexed, uncoordinated documents, which were again not bates-stamped and not identified as responsive to the particular requests that were made by APIC.

39.     Due to this late production of documents, the EUO of defendant, Swissa, was rescheduled for July 31, 2018.

40.     During Mr. Swissa's EUO, he testified that he had made claims against other insurers on behalf of other business entities that operated out of the same insured property.  Such documents had to, of course, be requested.  And when they were received, even these documents were not complete.

41.     It was not until May 24th, 2018 that Sound Connection first provided APIC with an estimate prepared by its public adjuster.  The estimate was frequently changed.  In fact, APIC was provided with three different estimates of damages prepared by its public adjuster, Zevuloni & Associates, Inc. and Joseph Zevuloni: one dated May 24, 2018, for $3,912,574.94; a second dated July 18, 2018, for $3,849,245.37; and a third estimate dated September 12, 2018, for $3,811,589.11.

42.     During Mr. Swissa's EUO, he was unable to answer most of the questions that were related to the itemized damages provided in the public adjuster's estimates.

43.     Additionally, at his EUO, it became apparent that Mr. Swissa failed to preserve important evidence relating to the claim. Specifically, when asked if he possessed photographs taken shortly after the hurricane, proving that loss and damage had occurred, he said that he had them on his cell phone, but he had since dropped that cell phone in the toilet destroying it.  When asked when that occurred, he advised that it was sometime this year, meaning that he was in

possession of the subject photographs for several months after the loss allegedly occurred, and yet, despite repeated demands from APIC, they were not provided.

44.     Notwithstanding that Swissa was incapable of producing what would have been highly relevant pictures that he took on his cell phone shortly after the hurricane, he did selectively print some of them out to be produced, such as pictures of a Mr. Michael Corcoran allegedly making repairs to certain electronic equipment that was used in connection with the operations of Mega Vault and damage to the car repairing operations of Shimon's Cars.  Mr. Corcoran also prepared a detailed listing of allegedly damaged electronic sound equipment, which totally approximately $700,000.

45.     When counsel for APIC requested to interview or to take the statement of Mr. Corcoran, it was refused.

46.     The defendant, Shimon Swissa, testified at his EUO that he hired an expert to allegedly recover the photographs from his cell phone that he allegedly dropped in a toilet. When APIC's counsel requested to interview or take the statement of this expert so as to asses what efforts were actually taken to recover the cell phone's contents, it was refused.

47.     Defendant, Shimon Swissa, was requested to provide tax and accounting records as to the Sound Connection and Mega Vault entities so that it could determine, among other things, which entity actually owned the equipment and personal property that was allegedly damaged and was being claimed against APIC and whether Mega Vault continued to operate after the hurricane, but this was also refused.  Nonetheless, only a few weeks before the filing of the instant complaint, Sound Connection's counsel sent to APIC's counsel various receipts for events/parties at the Mega Vault club after Hurricane *Irma*.  These invoices always would have

been readily available to Sound Connection since it shared the same owner as Mega Vault – *i.e.*, Shimon Swissa.

48.     Sound Connection provided APIC with two different invoices for water mitigation services.  The first, as stated above, was from Dry Masters for water extraction and drying-out services dated December 19, 2017, for a total of $177,187.44.  The second invoice was from a company called, Projekt Property Restoration, Inc., for an emergency service call for water extraction dated May 15, 2018.  Both of these were much after the hurricane.

49.     Based upon a very extensive investigation undertaken by APIC, with the assistance of various experts and professional consultants, APIC issued a formal letter to Sound Connection on October 15, 2018 advising it that the only storm-related damages were well below the applicable policy deductible, which was $177,000.  Notwithstanding this, Sound Connection demanded, through its counsel, that APIC submit to the appraisal process provided for in the subject policy.

### COUNT I – RESCISSION OF POLICY
#### (As to Sound Connection)

50.     APIC re-alleges the allegations contained in paragraphs one (1) through forty-nine (49), as if fully set forth herein and below.

51.     In completing its application for insurance, Sound Connection made misrepresentations, as referenced in paragraphs eleven (11) through twenty-one (21), *supra*.

52.     *Florida Statutes* §627.409 pertains to rescission of insurance policies based upon misrepresentations made in insurance applications, and provides as follows:

> (1) Any statement or description made by or on behalf of an insured . . . in an application for an insurance policy . . . or in negotiations for a policy or contract, is a representation and not a warranty.  Except as provided in subsection (3), a misrepresentation, omission, concealment of fact, or incorrect

statement may prevent recovery under the contract or policy only if *any* of the following apply:

**(a)**The misrepresentation, omission, concealment, or statement is fraudulent *or* is material to the acceptance of the risk or to the hazard assumed by the insurer.

**(b)**If the true facts had been known to the insurer pursuant to a policy requirement or other requirement, the insurer in good faith would not have issued the policy or contract, would not have issued it at the same premium rate, would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss.

(Emphasis added).

53.     As stated above, it was based upon and in reliance upon the truthfulness and accuracy of Sound Connection's application of insurance that APIC issued the subject policy and issued it at the particular premium.

54.     Sound Connection's misrepresentations were fraudulent because Sound Connection, through its owner, knew the true and accurate facts, and knew the statements and descriptions in the application did not comport therewith.

55.     Sound Connection's misrepresentations were material in that had APIC known the true set of facts, it would not have issued the policy of insurance or would have issued it at a considerably different premium.

56.     Due to the fraudulent and/or the material misrepresentations, the policy issued by APIC should be rescinded pursuant to *Florida Statutes* §627.409.

57.     In addition to the above, the subject policy states as follows with respect to fraud or misrepresentations:

> **A. CONCEALMENT, MISREPRESENTATION OR FRAUD**
> This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time.

> It is also void if you or any other insured, at any
> time, intentionally conceal or misrepresent a
> material fact concerning:
> **1.** This Coverage Part;
> **2.** The Covered Property;
> **3.** Your interest in the Covered Property; or
> **4.** A claim under this Coverage Part.

51.    The policy is void or may be voided – which APIC hereby elects to do – by reason of the fraud and misrepresentations of Sound Connection under this policy provision.

### COUNT II – RESCISSION FOR FRAUD IN MAKING THE CLAIM

58.    APIC re-alleges the allegations contained in paragraphs one (1) through forty-nine (49), as if fully set forth herein and below.

59.    Defendants, Zevuloni & Associates, Inc. and Joseph Zevuloni, created and prepared estimates of alleged damages at the insured premises.  These estimates were adopted by Sound Connection and its owner, Shimon Swissa, as being truthful and accurate, and were submitted to APIC in support of Sound Connection's claim for *Irma*-related damages under the subject APIC policy.

60.    As stated above, APIC thoroughly inspected the insured premises as part of its investigation of Sound Connection's claim.

61.    As part of its inspections, APIC hired various professional and engineering experts and consultants to assist in assessing Sound Connection's claim, and specifically the various and many items of alleged damages contained on the estimates.

62.    APIC was able to unequivocally determine that not only were the estimates significantly inflated, there were many items contained on the estimates that simply did not exist or did not come close to reflecting the accurate circumstances at the insured premises, such as, by way of example, *Irma*-related roof openings that did not exist; stucco delamination that did

not exist; drywall that did not exist; and allegedly damaged components of the building that did not exist.

63.     Defendants also represented, in support of Sound Connection's claim against APIC, that certain appurtenant mechanical equipment was destroyed during Hurricane *Irma*. However, during APIC's investigation, it was determined that such mechanical equipment was not actually in place at the time of Hurricane *Irma*.

64.     The Defendants also made a claim for the costs of the labor and materials associated this allegedly destroyed mechanical equipment, and other consequential damages allegedly associated therewith.

65.     The Defendants made a significant claim for labor and materials with respect to certain interior duct work that was allegedly necessitated by damage done by Hurricane *Irma*, but, during APIC's investigation, it was determined that this duct work had been installed prior to *Irma*.

66.     The Defendants made statements and claimed that the electrical, sound system, and air conditioning were not functioning as a result of Hurricane *Irma,* and as a result, that diminished or eliminated the use of the property, and specifically the club, "Mega Vault."

67.     APIC's investigation has, however, shown unequivocally that Mega Vault continued to operate after Hurricane *Irma* and that it continued to book events after *Irma*, and that, in fact, events were held there after *Irma* and even before Dry Masters, did its first "water mitigation."

68.     The estimates that containing these many and varied misrepresentations were compiled and prepared by Zevuloni & Associates, Inc. and Joseph Zevuloni.

69.     These estimates were approved and ratified by Sound Connection and its owner, Shimon Swissa, and submitted to APIC in support of its *Irma*-related claims under the subject APIC policy.

70.     The principal of Sound Connection, Shimon Swissa, took various photographs of the building and its condition – inside and the exterior – on his iPhone but concealed this highly relevant evidence from APIC for many months, and this evidence was then destroyed when Swissa allegedly dropped his phone in a toilet.

71.     As stated above, the subject policy states as follows with respect to fraud or misrepresentations:

> **A. CONCEALMENT, MISREPRESENTATION OR FRAUD**
> This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
> **1.** This Coverage Part;
> **2.** The Covered Property;
> **3.** Your interest in the Covered Property; or
> **4.** A *claim under this Coverage Part*.

(Emphasis added).  The policy is void *ab initio* or it may presently be voided – which APIC hereby elects to do – by reason of the above-described fraud and misrepresentations in connection with the claim under this policy provision.

### <u>COUNT III – CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT, FLORIDA STATUTE §772.101 (As to all Defendants)</u>

72.     APIC re-alleges the allegations contained in paragraphs one (1) through forty-nine (49), and fifty-nine (59) through seventy (70) as if fully set forth herein and below.

73. By reason of the above-described deceptive, misleading and/or fraudulent conduct in connection the claim made against APIC, the Defendants, individually and together, have violated *Florida Statutes* §817.234 because they prepared and presented the claim and the estimates knowing that they contained false, incomplete or at least misleading information, in support of the *Irma*-related claim against APIC, with the intent to injure, defraud or at least to deceive APIC.

74. By reason of the above-described conduct, the defendants have engaged in a pattern of wrongful activity as defined in the CIVIL REMEDIES AGAINST CRIMINAL PRACTICES ACT. *See Fla. Stat.* §722.101, *et seq*.

75. The Defendants constitute an "Enterprise," as defined in *Fla. Stat.* §772.102(3).

76. The objectives of the Enterprise are and were (a) to make inflated claims to Sound Connection's insurance carrier, APIC, with respect to alleged damages to the insured property from Hurricane *Irma*; (b) to make fraudulent claims to APIC with respect to same; (c) to extort money from APIC with respect to same; and, (d) to cause APIC to expend considerable sums of money making a detailed investigation into the fraudulent Hurricane *Irma*-related claims which would thereby increase the "settlement value" of the claim.

77. The Enterprise acted with intent to extort money from APIC by making false, misleading, deceptive and inflated Hurricane *Irma*-related claims.

78. The members of the Enterprise conducted the affairs of the Enterprise through a "pattern of criminal activity" as that term is defined in *Fla. Stat.* §§772.102 and 772.103.  The pattern of criminal activity consisted of numerous incidents occurring over a lengthy time-period, relating to fraudulent practices, false pretenses, and fraud generally.

79.     As part of their pattern of criminal activity, and in order to carry out or attempt to carry out their criminal activity, the Enterprise made multiple fraudulent claims as it related to the alleged Hurricane *Irma* damages at the insured premises, including the alleged items damaged; the costs of damaged items; and the costs to repair and/or replace alleged damaged items.

80.     APIC has been injured by the fraudulent, misleading and deceptive conduct made by the defendants in connection with the instant claim in an amount presently not fully determined, but certainly, APIC has expended well in excess of $75,000 just investigating the multi-varied aspects of the inflated/deceptive/fraudulent estimates.

81.     APIC is, therefore, entitled to actual damages pursuant to *Fla. Stat.* §772.104, which are in excess of $75,000, and APIC is also entitled to three times its actual damages, plus costs and reasonable attorneys' fees that are incurred in connection herewith.

## COUNT IV- DECLARATORY JUDGMENT
### (as to Sound Connection)

82.     APIC re-alleges the allegations contained in paragraphs one (1) through forty-nine (49), and fifty-nine (59) through seventy (70) as if fully set forth herein and below.

83.     APIC requests a judgment pursuant to the DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201 and 2202 for the purpose of declaring that there is no coverage for the claims made by defendant, Sound Connection, due to its failure to perform and breach of its post-loss duties required by the subject policy.

84.     APIC seeks a declaratory judgment regarding its rights and obligations, if any, under the Policy.

85.     Specifically, APIC is in doubt as to its rights and obligations under the policy with respect to the following provision:

**Duties in The Event of Loss or Damage**
**a.** You must see that the following are done in the event of loss or damage to Covered Property:
**(1)** Notify the police if a law may have been broken.
**(2)** Give us prompt notice of the loss or damage. Include a description of the property involved.
**(3)** As soon as possible, give us a description of how, when and where the loss or damage occurred.
**(4)** Take all reasonable steps to protect Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside in the best possible order for examination.
**(5)** At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.
**(6)** As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.
**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.
**(8)** Cooperate with us in the investigation or settlement of the claim.

79.     There is a *bona fide*, actual, present practical need for the declaration as Defendant, Sound Connection is actively pursuing claims under the subject policy.

80.     Further, as referenced in more detail above, Sound Connection failed to comply with its post-loss duties required by the policy by: (1) providing late notice of the claim (over fifty days after the alleged loss); (2) failing to provide requested documentation in a timely and efficient manner despite repeated attempts by APIC; (3) failing to preserve and/or concealing highly relevant evidence; making misrepresentations in connection with the claim.  This has severely prejudiced APIC's rights and its investigation of the claim.

81.     Due to Defendant, Sound Connection's failure to perform its post-loss duties under the subject policy, APIC seeks a declaration that there is no coverage under the policy.

82.     The declaration deals with a present, ascertained or ascertainable state of facts or present controversy as to the state of facts.

83.     APIC's privileges and rights under the Policy are dependent upon the facts or the law applicable to the facts.

84.     Defendant, Sound Connection has an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law.

85.     The antagonistic and adverse interests are all before the Court by proper process.

86.     The relief sought is not merely the giving of an advisory opinion by the Court, or the answer to a question propounded from curiosity.

*Wherefore*, the Plaintiff, AMERICAN PROPERTY INDEMNITY COMPANY, requests that this Court enter a judgment declaring that the policy issued to SOUND CONNECTION DISTRIBUTORS, INC. is hereby voided and/or void *ab initio*; that there is no coverage for the subject claim; and also requests judgment against the Defendants, SOUND CONNECTION DISTRIBUTORS, INC., SHIMON SWISSA; ZEVULONI & ASSOCIATES, INC., and JOSEPH ZEVULONI for damages in excess of the sum of $75,000; and also that the Court award AMERICAN PROPERTY INSURANCE COMPANY its costs and reasonable attorney's fees incurred in connection herewith.

Respectfully submitted,

 */s/Michael Buckley*
**Michael B. Buckley, Esq.**
FBN: 365734
BUCKLEY LAW GROUP, P.A.
*Counsel for APIC*
3637 Fourth Street North, Suite 330

St. Petersburg, FL 33704
Phone: 727-822-4800
Fax: 727-822-4855
Primary Email:
mbuckley@buckleylawgroup.com
jseipel@buckleylawgroup.com
Secondary Email:
hdalmanieras@buckleylawgroup.com
jparmerlee@buckleylawgroup.com